Mr. Good Mr. Salem Thank you, Your Honor. May it please the Court, at the heart of this case is whether the plaintiff appellant, who I represent, Pamela Ferrill, was meeting the legitimate expectations of the Oak Creek School District. The District Court upheld the defendant's position that Ms. Ferrill was not meeting... Oh, I'm sorry, you're Mr. Good, not Mr. Salem. I'm sorry, I was looking at the wrong card. I apologize. It's okay. Usually I get some sort of joke on my last name, so I'll take the other name. It's our position, however, that Ms. Ferrill was in fact meeting the legitimate expectations of the school district and had been subject to various levels of scrutiny based on complaints arising from a very racially tense atmosphere at the school district. There had been teachers that she had confronted over concerns that they were disciplining African American students in an outsized manner. These teachers then went to the superintendent of the school to explain that they felt that the leadership was eroding and the morale was collapsing. But these types of documented problems really didn't occur until 2009. Are you referring to the two teachers who were falsely accused of having sex in school? There were two different instances. So there was an initial instance in November of 2008 in which two students of color spread rumors that the two fifth grade teachers were having some sort of extramarital affair. There was a second case in January 2009 in which a second grade teacher allegedly hit a student of color, which warranted an investigation. It was after that first instance in November of 2008 that a meeting was set between Ms. Ferrill and the superintendent to discuss morale issues. This was followed up with an email later that month asking for the opportunity for the teacher who had been accused of treating his students of color differently to clear the air. As I say though, the real performance issues, such as they are, really only came to light in Ms. Ferrill's second year at the school. The 2008-2009 school year were not marked by written warnings or detailed explanations for disagreements between teachers and Ms. Ferrill. There was, as I'm sure the defense counsel will say, a management consulting group that came in in January of 2009 with the purpose of trying to improve communications. It really wasn't until the fall of 2009, after Ms. Ferrill had not been afforded the opportunity to find a good or adequate mentor, and in fact the mentor that was assigned to her by the superintendent was disregarding her concerns that as the African-American principal of a very large majority white student populace as well as faculty, that she had a difficult time communicating with people. It was then after that that there was this instance in November 2009 where Ms. Ferrill accused Ms. Superintendent Burmeister of potentially dealing with her in an inappropriate manner because she believed white faculty regarding whether a meeting had been scheduled. So these continued on and it was after this instance in November 2009 that Superintendent Burmeister and Assistant Superintendent Kujawa began papering Ms. Ferrill's file with letters of five or six pages taking issue with all kinds of small, I would say petty potentially, issues. But the consultant was brought in halfway through the prior school year to try to improve her performance. It wasn't just in trying to improve her performance because there were other staff and faculty that were involved in these groups. But certainly communication was an issue that was sought to be improved. There had been a large turnover some years prior to Ms. Ferrill beginning her employment that suggested that there was a dissension amongst the ranks. When the consultant says, for example, our professional opinion was and is that Ms. Ferrill exhibited extremely poor leadership skills, isn't that the sort of thing that, isn't that a presumably impartial criticism that the school would be entitled to give significant weight to? That's just one. There are a lot of other criticisms. Certainly. These are paid consultants, however, that the superintendent brought in specifically and had personal relationships with prior. But as it relates to whether it then justified their belief that Ms. Ferrill was not meeting the legitimate expectations, there's other evidence in the record suggesting that she was, in fact, meeting those legitimate expectations. She had participated in some of these consulting groups, to take one instance, but then also had received a positive or neutral, at the very least, performance evaluation by the superintendent the summer before she began experiencing this additional scrutiny after confronting the superintendent over what she believed to be disparate treatment. Defense counsel suggests that this type of scrutiny had begun in 2008 when she began, but really it only surfaced as soon as Ms. Ferrill began talking to staff about how to engage students in discussing racial disparities and calling into question whether the teachers themselves could play a role. Ms. Ferrill had, in fact, gone to the multicultural club and said, we need to do a better job of counseling students outside of class about how to deal with these things. So the real scrutiny about her performance concerns, or about the school district's putative concerns, really only began after Ms. Ferrill had formally stated her opposition, with the Jackie Subberdewitts matter, to being treated differently than some of her colleagues. And that played out later in January where a white assistant principal, Sheila Momberg, also had her contract non-renewed, which was the same as Ms. Ferrill. And Ms. Momberg, again a white assistant principal, had been placed on a performance improvement plan or action plan, as had Ms. Ferrill. However, it was Ms. Burmeister, four days after meeting with Ms. Ferrill to discuss the terms of that action plan, that she recommended this non-renewal. And it was in a meeting on January 7th between Ms. Ferrill, Superintendent Burmeister, and the attorneys for their respective parties, in which Ms. Ferrill again voiced her concerns that she was being treated differently. Excuse me, a question. The action plan that Ms. Ferrill was placed on and Ms. Momberg were placed on, when were they, relatively speaking, were they about the same time period? Were they placed on the action plan about the same time period or at different periods of time? Ms. Momberg was placed on the action plan in the early fall, and the principal, Ferrill, was placed in winter, in December. So there had been a lapse of time. Okay, so Ms. Momberg was placed on the action plan in the early fall, given an opportunity to try to work things out and improve it, and then she was, as I understand it, her contract was not, it was in fact renewed in January, is that what happened? And then they subsequently, after the fact, she fell back off the wagon, so to speak, and then she ultimately was terminated. Is that correct? That's correct. So she was given some months' time to improve under the action plan, correct? That is correct. And then Ms. Ferrill's contract was not renewed four days after the action plan? That's correct. And there will be a distinction here between not rolled over and non-renewed. And the distinction, obviously, is also important as it relates to the Prima Fascia case here, because it's our contention that not rolling over her contract was an adverse employment action that had a bad effect on her career. Obviously, she was placed on suspension administrative leave only weeks after this decision to non-roll over her contract, and she remained off of work without receiving any type of correspondence from the school regarding her potential reemployment or reinstatement, which, again, she never had the opportunity to try to improve her performance based on the terms of the action plan, some of which she disagreed with. Just so I'm clear, the decision not to roll over the contract by January, they were both subject to that same action about the same time, correct? Correct. I see that I'm out of time, so I'm in rebuttal. That's fine. Thank you, Mr. Good. Mr. Wistrom? Good morning, Your Honors. May it please the Court. This case is ultimately all about the decision of the Oak Creek Franklin School Board to stop the automatic renewal or the automatic rollover of Ms. Farrell's contract in January of 2010. And before we get to the specific claims that she presents, I think there are a couple salient facts that need to be mentioned. First of all, the recommendation to hire Ms. Farrell was made by Dr. Burmeister in July of 2008, affirmed by the school board. Dr. Burmeister was also the same individual who subsequently recommended the stopping of the automatic rollover of the contract in January of 2010. So clearly we have the same actor inference in this case. Ms. Farrell was only employed by the district for approximately two years. The second fact that's important is there's a distinction between stopping an automatic rollover and a decision to non-renew somebody's contract. Ms. Farrell was under a two-year contract, and the contract provided, pursuant to Chapter 118.24 of the Wisconsin Statutes, that in order to non-renew that contract, the district had certain steps it had to go through. Five months before the contract expired, they had to provide preliminary notice, they had to give her an opportunity for a hearing, and four months before it expired, they had to provide her with final notice of non-renewal. Now, her contract went through June 30th of 2011. So a non-renewal never happened in this case with respect to Ms. Farrell. What the contract provided was that if the district didn't provide notice of the stopping of the automatic rollover a year and a half before the contract was set to expire, so that was January of 2010, the contract would automatically renew for another year. So by stopping the automatic rollover, it provided the district with the opportunity a year later in January of 2011 to start the non-renewal process. Now, Mr. Goodtester indicated that Sheila Momberg was actually non-renewed. That was not the case in 2010. What happened was Ms. Momberg and Ms. Farrell were both put on a plan of improvement. Now, I don't believe the record indicates the date that Ms. Momberg was put on the plan of improvement. I believe it actually happened around the same time in December of 2009. Both individuals were then put, their contracts were, the automatic rollover was stopped in January 11th of 2010. Sheila Momberg made improvements to her performance, which resulted in the school district deciding in 2011 to allow her contract to renew. They didn't start that non-renewal process. So she continued, her contract was extended, and a year later, ultimately her performance again deteriorated. They again provided notice of the automatic stopping of the contract. And then a year after that, in 2013, they provided preliminary notice of the intent to non-renew her contract. And at that point, she resigned her employment. Counsel? Yes. Let me just cut to the chase with a question here. Isn't the real issue, the whole issue, the whole case here, whether or not the district court was correct when he determined that in weighing, when he actually weighed the factors as to whether or not the various elements of the cause of action existed, specifically with respect to whether there were legitimate, whether she was meeting legitimate expectations. He laid out those factors that favored your client. He also actually pointed to factors that were raised by the plaintiff. But it appears here that he weighed those factors himself as opposed to allowing the jury to do so. So doesn't this actually boil down to whether or not the district court appropriately determined that these factors, as a matter of law, made it impossible for Ms. Farrell to meet the elements of the cause of action? So it really comes down to whether or not you can look at all these factors and basically decide, as it appears the district judge did here, that he decided that when he weighed the factors that he favored your side, rather than the fact that it appears that these are issues of fact that a jury, a reasonable jury, could go either way. Isn't that the issue that we have to decide here? That is the issue. And the judge found both that she failed to establish, she has the burden of proof to establish, that one, she was meeting the reasonable expectations of the school district, and secondly, that she could point to somebody similarly situated who was treated more favorably outside the protected class. And she failed to establish both those elements. So your position, as I understand it, is when the court decided that she couldn't meet the burden of establishing, she was meeting the legitimate expectation based on hearsay complaints that were received early on and when she first was appointed by different teachers. There was an anonymous survey, as I understand it, and then there were discussions that Ms. Burmeister had with her after these various incidents. So those were there. There were also performance evaluations that she had in 2008 and 2009. So like in the summer before the fall when things hit the fan, so to speak, she had a satisfactory evaluation. So I guess what I'm saying is that there were factors, and the question is whether those factors actually would support a reasonable jury to conclude one way or the other versus having to determine as a matter of law. And that's the whole issue here, correct? And certainly there were some facts that plaintiff's counsel pointed out in opposing summary judgment that supported, at least in argument, that she was meeting the reasonable expectations of the district. So why isn't that for a jury to decide whether they accept those facts and whether based on those facts she was meeting the expectations even given what was being claimed by the defense? Why isn't that a jury question? Because the evidence was so overwhelming, Your Honor. We submitted affidavits of 10 individuals that supported the district's position that she was not meeting the expectations. Now, a few of the initial complaints came from students and staff. Dr. Burmeister investigated those complaints. She looked into them. She started having regular meetings with Ms. Farrell in the fall of 2008, which was the initial year of her contract. It wasn't the second year. This was the first year. She also received complaints from Ms. Kelso, who was the union representative. She was meeting with staff. The morale within the school was terrible. There were significant concerns within the school. We submitted affidavits of five and ó Is it documented in her personnel file, or is it just in the record by virtue of the declaration? Well, Dr. Burmeister didn't document a lot of the concerns initially. Now, she did bring in the outside consultant in January of 2009, which was about six months intoó Let me ask a specific question again so I understand. Any of the concerns, dissatisfactory performance issues that are in the declarations to support the motion for summary judgment, are any of those ó in her personnel file? The complaints continued throughout her employment. The complaints and the concerns were documented in her performance review in June of 2009. She received a satisfactory review? I don't believe it was satisfactory. It listed a few strengths, but it listed a number of areas where she needed improvement. Isn't there a bottom line where you get a satisfactory evaluation? This wasn't a numerical score. There are certain strengths you have, and there are certain areas that need improvement. So that was June of 2009. This was after measurable management was brought in as the outside consultant, who ultimately recommended the only way to improve the morale in the situation at the elementaryó I want to focus on what's in her personnel fileó Okay, so we have the performance reviewó versus the declaration. Performance review in June of 2009, which I do not believe was satisfactory. We have a goals and objective document that was created by Dr. Burmeister in September of 2009, setting forth specificó Can I ask you this question? If the performance evaluation is not the type where there's an ultimate rating, satisfactory, not satisfactory, you're telling me that that's not how it's done. It's doneóbasically it goes through the different issues or different areas, and it says either you haveóthere's a performance issue, you need improvement, or you're okay. Correct? Correct. All right. Why isn't it a jury'sówhy isn't it a determination for the jury to look at that in terms ofóin context with all the other circumstances that go both ways to make a determination as aó isn't that a question of fact as to whether or not she met legitimate expectations? How is that a determination to be made as a matter of law? Because, again, the evidence was so overwhelming, and Ms. Farrell failed to rebut all these allegations and all of the concerns that Dr. Burmeister had. They were in the performance review. They were in a document called Goals and Objectives in September of 2009, and they were part of the formal performance improvement plan that was issued in December of 2009, December 4th of 2009. But doesn't the jury get to make a determination based onóeven in the absence of direct evidence, circumstantial evidence, and inference, look at both sides, weigh it out, and make that determination? Isn't that the jury's job versus the judge's job to weigh out factual disputes? In certain cases, absolutely, but not in this case. I think the facts of this case were so compelling that the judge correctly found that she could not meet her burden of proof. And I believe the decision should be affirmed on that basis as well as the reasons set forth in our briefs. Okay. Mr. Goode, your time expired, but you can have a minute if you'd like. I'll just take one. Defendant's contention that any inference of discrimination was negated because Dr. Burmeister was both the same hirer and ultimate decider is an inference that is for a jury to decide. And as the questions bear out, and as the Supreme Court held in both Reeves and in Anderson, these types of determinations are properly before a jury. They should not be weighed by a court. And with that, we would ask that this decision of the Eastern District be reversed. Thank you. Okay. Thank you very much to both counsel.